**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT COURT OF**
**FLORIDA PENSACOLA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel* **BRANDI STUART and BRANDI STUART,**<br><br>    **Plaintiffs,**<br><br>vs.<br><br>**TRACY HARRELL;  SIMPLY SOUTHERN STYLES CORP.; EMMA JEAN KIDS, LLC; BANANA SPLIT, LLC; THREE SISTERS DESIGNS, LLC, and MILLIE JAY, LLC,**<br><br>    **Defendants.** | Case No:____3:20-CV-5602____<br><br>COMPLAINT<br><br><br>FILED UNDER SEAL PURSUANT TO FEDERAL FALSE CLAIMS ACT 31 U.S.C. 3730(b)(2); N.D. LOC. R 5.5(b)<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff-Relator, BRANDI STUART ("STUART"), on her own behalf and on behalf of the United States of America (the "Government" or the "Federal Government", by and through undersigned counsel brings the instant Complaint Against Defendants, TRACY HARRELL ("HARRELL"); SIMPLY SOUTHERN STYLES CORP ("SIMPLY SOUTHERN"); EMMA JEAN KIDS, LLC ("EMMA JEAN"); BANANA SPLIT, LLC ("BANANA SPLIT"); THREE SISTERS DESIGNS, LLC ("THREE SISTERS"); and MILLIE JAY, LLC ("MILLIE JAY"), and states as follows:

FILED USDC FLND PN
   JUL 1 '20 PM3:08

## I. GENERAL ALLEGATIONS

### A. Introduction

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims made and caused to be made by Defendants and/or her/its agents and employees, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("the FCA"), and for other related relief.

2.      Specifically, and without limitation, this action seeks to recover substantial unpaid tariffs, import duties, taxes, and other sums owed to the Federal Government on goods imported into the United States by Defendants from foreign countries including but not limited to China and Vietnam.

3.      This action alleges that Defendant, HARRELL, individually and together with others, through her s-corporation, Defendant SIMPLY SOUTHERN and its wholly owned LLC subsidiaries, Defendants, EMMA JEAN; BANANA SPLIT; THREE SISTERS DESIGNS, ("THREE SISTERS"); and MILLIE JAY (collectively, "SIMPLY SOUTHERN") knowingly engaged in falsely underrepresenting the cost and value of imported apparel manufactured in foreign

countries in order to avoid paying tariffs, import duties and other sums payable to the Federal Government during the import/customs process.[1]

4.      Specifically, HARRELL, individually and with others, through the above-named entities engaged in a scheme by which HARRELL contracted with foreign companies for the production of apparel, fabric, and other goods.

5.      HARRELL, individually and with others, through the above-named entities then paid the contract price for the goods, either directly to the foreign manufacturers or indirectly to third parties who then transferred the full purchase price to the manufacturers.[2]

6.      At the behest of HARRELL, the foreign manufacturers produced invoices and documents used during the import and customs process which fraudulently listed a much lower value for the goods than what was actually paid.

7.      This resulted in a false and artificially low value on the imports being used to calculate the tariffs, duties, and other sums owed to the Federal Government on the imported goods.

---

[1] Unless otherwise indicated herein, all references to HARRELL include HARRELL, individually and acting through one or more of the Defendant subsidiaries.

[2] Plaintiff-relator became aware that at least one such relationship involved HARRELL transferring funds, individually or through her business entities to U.S. resident family members of foreign manufacturers or factory owners.

8.      HARRELL and SIMPLY SOUTHERN thereby evaded payment of the full amounts due to the Federal Government.

9.      Upon information and belief, HARRELL and SIMPLY SOUTHERN have engaged in this scheme since as early as 2011 when HARRELL took over the company.

10.     Upon discovery of the above-referenced scheme in 2019, STUART, then an employee of SIMPLY SOUTHERN, confronted HARRELL about the fraud and began demanding that HARRELL cease fraudulent activities.

11.     HARRELL refused, and engaged in multiple retaliatory and harassing behaviors including but not limited to shutting Plaintiff out of business meetings and decisions to which she had previously been a party, denying Plaintiff access to company books, records, finances, e-mail and other accounts, refusing to pay Plaintiff compensation owed to her in the form of salary and bonuses, forcing Plaintiff to surrender her company-titled vehicle (for which Plaintiff was paying), engaging in unwarranted criticism of Plaintiff's work, and ultimately terminating Plaintiff's employment as a result in March, 2020.

12.     HARRELL and SIMPLY SOUTHERN have a financial disincentive to pay the full amount due to the Federal Government as the payment of the full amount due would put them at a competitive disadvantage by raising their cost to

manufacture goods, resulting in reduced profits or necessitating that they increase the retail price of their goods in order maintain their profit margin.

13.     The FCA was enacted during the Civil War, and was substantially amended in 1986 and again in 2009 and 2010. Congress amended the FCA in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that the FCA, which Congress characterized as a primary tool for combating such fraud, was in need of modernization. The amendments create incentives for individuals to come forward with information about fraud against the government without fear of reprisals or Government inaction, and enable the use of private legal resources to prosecute fraud claims on the government's behalf.

14.     The FCA prohibits, *inter alia*, any person to, "[m]ake, use[], or cause[] to be used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceali[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government," or to conspire to do so. 31 U.S.C. § 3729(a)(1)(C); (G).

15.     The "Whistleblower Protection" provisions of 31 U.S.C §3730(h) further provide:

(h)     Relief From Retaliatory Actions.

(1)    In general.

Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2)    Relief.

Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

16.    The FCA allows any person having information about an FCA violation to bring an action for himself and the government, and to share in any recovery. *See* 31 U.S.C. §3729(d). It further provides for an award of attorney's fees and costs. *Id.*

17.    The FCA requires that the complaint be filed under seal for a minimum of sixty (60) days (without service on the defendant during that time) to allow the government to conduct its own investigation and determine whether to join the suit.

18.    Based upon the foregoing laws, *qui tam* Plaintiff, STUART, seeks through this action to recover all available damages, civil penalties, and other relief

for the violations alleged herein in every jurisdiction to which Defendants' misconduct has extended.

## B. Parties

19.     Plaintiff/Relator, STUART, is a resident of the city of Saraland, Mobile County, AL. In or around 2010, Plaintiff founded a children's clothing company for which she designed, manufactured, and sold children's apparel and other merchandise. This company ultimately expanded to become SIMPLY SOUTHERN and its subsidiaries. In the course of growing the business, Plaintiff employed her two sisters, Defendant, HARRELL and their other sister, Jami Johnston.

20.     In or around 2011, Plaintiff transferred ownership and control of the business to Defendant, HARRELL, but continued to perform work for SIMPLY SOUTHERN, primarily in designing clothing, but also in marketing and attending trade shows to promote the company's products and to select raw goods such as fabric, buttons, ribbons, and the like to incorporate into the company's designs.

21.     Defendant, HARRELL, is a resident of 1513 Sabal Palm Dr., Gulf Breeze, Santa Rosa County, Florida, 32563 and is the owner, president, sole shareholder, and resident agent of Defendant, SIMPLY SOUTHERN.

22.     Defendant, SIMPLY SOUTHERN, is a Florida single shareholder S-corporation with its principal business address at 1513 Sabal Palm Dr., Gulf Breeze, Santa Rosa County, Florida, 32563.

23.     Defendant, EMMA JEAN, is a Florida limited liability company and wholly owned subsidiary of Defendant, SIMPLY SOUTHERN, which is also its only authorized member. EMMA JEAN has a principal business address of 1513 Sabal Palm Dr., Gulf Breeze, Santa Rosa County, Florida, 32563.

24.     Defendant, THREE SISTERS, is a Florida limited liability company and wholly owned subsidiary of Defendant, SIMPLY SOUTHERN, which is also its only authorized member. THREE SISTERS has a principal business address of of 1513 Sabal Palm Dr., Gulf Breeze, Santa Rosa County, Florida, 32563.

25.     Defendant, MILLIE JAY, LLC is a Florida limited liability company and wholly owned subsidiary of Defendant, SIMPLY SOUTHERN, which is also its only authorized member. MILLIE JAY has a principal business address of 1513 Sabal Palm Dr., Gulf Breeze, Santa Rosa County, Florida, 32563.

26.     Defendant, BANANA SPLIT, is a Florida limited liability company and wholly owned subsidiary of Defendant, SIMPLY SOUTHERN, which is also its only authorized member. BANANA SPLIT has a principal business address of 1513 Sabal Palm Dr., Gulf Breeze, Santa Rosa County, Florida, 32563.

### C. Jurisdiction and Venue

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C §§ 3729;

3730. Although the issue is no longer jurisdictional following the 2009 amendments to the FCA, to Relator's knowledge there has been no statutorily relevant public disclosure of the "allegations or transactions" in this complaint as those concepts are used in 31 U.S.C. § 3730(e).

28.    Moreover, whether or not such a disclosure has occurred, Relator has direct and independent knowledge about the conduct alleged herein, and that knowledge is independent of and materially adds to any publicly disclosed allegations or transactions related to her claims.

29.    As to any state law or other claims over which this Court does not have original or exclusive jurisdiction, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), and said claims are not subject to any exception of §1367(c).

30.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) which for provides for nationwide service and that

> Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred. A summons as required by the Federal Rules of Civil Procedure shall be issued by the appropriate district court and served at any place within or outside the United States.

31.    Venue is likewise proper pursuant to 31 U.S.C §3732(a).

### D. The Customs and Import Process

32.     On March 1, 2003, U.S. Customs and Border Protection, ("CBP"), was formed as an agency of the Department of Homeland Security, merging functions of the former Customs Service, Immigration and Naturalization Service, Border Patrol, and Animal and Plant Health Inspection Service.

33.     A detailed overview of the CPB and the U.S. import and customs process is publicly available in a publication of the CPB titled, "Importing into the United States: *A Guide for Commercial Importers*," (The "CPB Guide") which is maintained on its website at:

https://www.cbp.gov/sites/default/files/documents/Importing%20into%20the%20U.S.pdf.

34.     "The Customs Modernization Act (Title VI of the North American Free Trade Agreement Implementation Act [P.L. 103-182, 107 Stat. 2057]) became effective December 8, 1993..[and shifted] to the importer, the legal responsibility for declaring the value, classification, and rate of duty applicable to entered merchandise." (*See* **CPD GUIDE**, p. 1)

35.     "When a shipment reaches the United States, the importer of record (i.e., the owner, purchaser, or licensed customs broker designated by the owner, purchaser, or consignee) will file entry documents for the goods with the port director at the goods' port of entry. Imported goods are not legally entered until after the shipment has arrived within the port of entry, delivery of the merchandise has been authorized by CBP, and estimated duties have been paid. It is the importer of

record's responsibility to arrange for examination and release of the goods." *Id.* at 11. *See also* 19 U.S.C. 1484.

36.    19 U.S.C § 1484 governs the Entry of Merchandise into the United States, and imposes a duty of reasonable care on the importer and its agents with regard to importation, which duty extends, *inter alia*, to the importer's obligations to:

- Make entry therefor by filing with the Bureau of Customs and Border Protection such documentation or, pursuant to an authorized electronic data interchange system, such information as is necessary to enable the Bureau of Customs and Border Protection to determine whether the merchandise may be released from custody of the Bureau of Customs and Border Protection. 19 U.S.C. 1484(a)(1)(A).

- complete the entry, or substitute 1 or more reconfigured entries on an import activity summary statement, by filing with the Customs Service the declared value, classification and rate of duty applicable to the merchandise, and such other documentation or, pursuant to an electronic data interchange system, such other information as is necessary to enable the Customs Service to—

  - properly assess duties on the merchandise;
  - collect accurate statistics with respect to the merchandise; and
  - determine whether any other applicable requirement of law (other than a requirement relating to release from customs custody) is met.

19 U.S.C. 1484(a)(1)(B).

37.    Following presentation of the entry, entry summary documentation is filed and estimated duties are deposited within 10 working days of the entry of the

merchandise at a designated customhouse. Entry summary documentation consists of:

- Return of the entry package to the importer, broker, or his authorized agent after merchandise is permitted release,

- Entry summary (CBP Form 7501),

- Other invoices and documents necessary to assess duties, collect statistics, or determine that all import requirements have been satisfied.

(*See* **CPD GUIDE**, p. 13). A copy of CBP Form 7501 is attached hereto as **EXHIBIT "A"**.

38.   19 U.S.C § 1481 sets forth the requirements for invoices and content descriptions to be provided with imports. The statute requires, *inter alia*:

- A detailed description of the merchandise, including the commercial name by which each item is known, the grade or quality, and the marks, numbers, or symbols under which sold by the seller or manufacturer in the country of exportation, together with the marks and numbers of the packages in which the merchandise is packed.

- The quantities in the weights and measures of the country or place from which the merchandise is shipped, or in the weights and measures of the United States;

- The purchase price of each item in the currency of the purchase, if the merchandise is shipped in pursuance of a purchase or an agreement to purchase;

- The kind of currency, whether gold, silver, or paper;

- Any other fact that the Secretary may by regulation require as being necessary to a proper appraisement, examination and classification of the merchandise.

19 U.S.C 1481(a)(3); (4); (5); (7); (10); *e.g.*, **CPD GUIDE**, p. 35.

39. As part of its publicly available "Reasonable Care Checklists", the CPB instructs importers as follows:

> **Questions by Topic: Merchandise Description & Tariff Classification**
>
> *Basic Question:* Do you know what you ordered, where it was made, and what it is made of?
>
> 1. Have you provided a complete, accurate description of your merchandise to CBP in accordance with 19 U.S.C. 1481? (Also, see 19 CFR 141.87 and 19 CFR 141.89 for special merchandise description requirements.)
>
> 2. Have you provided CBP with the correct tariff classification of your merchandise in accordance with 19 U.S.C. 1484?

(*See* **CPD GUIDE**, p. 27)

> **Valuation**
>
> *Basic Questions:* Do you know the "price actually paid or payable" for your merchandise? Do you know the terms of sale? Whether there will be rebates, tie-ins, indirect costs, additional payments? Whether "assists" were provided or commissions or royalties paid? Are amounts actual or estimated? Are you and the supplier "related parties"?
>
> 1. Have you provided CBP with a proper declared value for your merchandise in accordance with 19 U.S.C. 1484 and 19 U.S.C. 1401a?

(*See Id*. at 28)

40. 19 U.S.C § 1401 governs the valuation of imported merchandise which is based on the "transaction value" of the imports. 19 U.S.C. 1401 (a)(1). With the

exception of circumstance not relevant to the instant case, transaction value is defined by 19 U.S.C § 1401 (b) as follows:

(1) The transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States, plus amounts equal to—

(A) the packing costs incurred by the buyer with respect to the imported merchandise;

(B) any selling commission incurred by the buyer with respect to the imported merchandise;

(C) the value, apportioned as appropriate, of any assist;

(D) any royalty or license fee related to the imported merchandise that the buyer is required to pay, directly or indirectly, as a condition of the sale of the imported merchandise for exportation to the United States; and

(E) the proceeds of any subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly, to the seller.

The price actually paid or payable for imported merchandise shall be increased by the amounts attributable to the items (and no others) described in subparagraphs (A) through (E) only to the extent that each such amount (i) is not otherwise included within the price actually paid or payable; and (ii) is based on sufficient information. If sufficient information is not available, for any reason, with respect to any amount referred to in the

> preceding sentence, the transaction value of
> the imported merchandise concerned shall be
> treated, for purposes of this section, as one
> that cannot be determined.

41.   19 U.S.C. 1401(a)(4) defines "price actually paid or payable" as

> ...the total payment (whether direct or indirect, and
> exclusive of any costs, charges, or expenses incurred for
> transportation, insurance, and related services incident to
> the international shipment of the merchandise from the
> country of exportation to the place of importation in the
> United States) made, or to be made, for imported
> merchandise by the buyer to, or for the benefit of, the
> seller.

42.   19 U.S.C. § 1592 establishes penalties for fraud, gross negligence, and

negligence regarding false information provide in relation to the above-referenced

documentation and provides, *inter alia*:

**(a)   Prohibition**

> (1)   General rule. Without regard to whether the United
> States is or may be deprived of all or a portion of
> any lawful duty, tax, or fee thereby, no person, by
> fraud, gross negligence, or negligence—
>
> > (A)   may enter, introduce, or attempt to enter or
> > introduce any merchandise into the
> > commerce of the United States by means
> > of—
> >
> > > (i)   any document or electronically
> > > transmitted data or information,
> > > written or oral statement, or act which
> > > is material and false, or
> > >
> > > (ii)   any omission which is material, or

(B)    may aid or abet any other person
to violate subparagraph (A).

\*\*\*\*\*\*

**(c)    Maximum penalties.**

(1)    Fraud. A fraudulent violation of subsection (a) is
punishable by a civil penalty in an amount not to
exceed the domestic value of the merchandise.

(2)    Gross negligence. A grossly negligent violation of
subsection (a) is punishable by a civil penalty in an
amount not to exceed—

(A)    the lesser of—

(i)the domestic value of the merchandise, or
(ii)four times the lawful duties, taxes, and
fees of which the United States is or may be
deprived, or

(B)    if the violation did not affect the assessment
of duties, 40 percent of the dutiable value of
the merchandise.

(3)    Negligence. A negligent violation of subsection (a)
is punishable by a civil penalty in an amount not to
exceed—

(A)    the lesser of—

(i)    the domestic value of the merchandise,

or

(ii)    two times the lawful duties, taxes, and
fees of which the United States is or
may be deprived, or

> (B)   if the violation did not affect the assessment
>        of duties, 20 percent of the dutiable value of
>        the merchandise.

*E.g,* **CPD GUIDE**, p. 39 ("It is particularly important that all statements relating to merchandise description, price or value, and amounts of discounts, charges, and commissions be truthfully and accurately set forth...It is important, too, that the invoice otherwise reflect the real nature of the transaction pursuant to which the goods were shipped to the United Sates.")

43.   All goods imported into the United States are subject to duty or duty-free entry in accordance with their classification under the applicable items. in the Harmonized Tariff Schedule of the United States. (*See* **CPD GUIDE**, p. 40).

44.   When goods are dutiable, *ad valorem*, specific, or compound rates may be assessed. An ad *valorem rate*, which is the type of rate most often applied, is a percentage of the value of the merchandise, such as five percent ad valorem. A specific rate is a specified amount per unit of weight or other quantity, such as 5.9 cents per dozen. A compound rate is a combination of both an *ad valorem* rate and a specific rate, such as 0.7 cents per kilo plus 10 percent ad valorem. *Id.*

45.   Rates of duty for imported merchandise may vary depending upon the country of origin. *Id.*

46.   There is no provision under which U.S. duties or taxes may be prepaid in a foreign country before exportation to the United States. *Id.* at 43.

47.   The valuation of goods and the accompanying information regarding country of origin, classification of goods, and tariff and duty rates are inputted to CBP form 7501 for the purpose of determining the amounts owed to the CBP and the Federal Government on the imports.

### E. Factual Allegations

### 1. Relator's Background

48.   STUART has worked in the apparel industry for many years as an employee, designer, business founder and owner, including as the former owner of the entity that became SIMPLY SOUTHERN and its subsidiaries.

49.   In this capacity she has regularly dealt with the import and customs process, both directly and through agents and brokers.

50.   She has experience in the selection of vendors, manufacturers, and materials, and negotiations involving the same, including but not limited to foreign exporters.

51.   She has worked for and with SIMPLY SOUTHERN and its subsidiaries in their various incarnations since 2010 and has knowledge of the business, its practices, employees, shareholders and owners.

52.   Following transfer of the ownership of the company to HARRELL, STUART was increasingly phased out of involvement in the financial management

of the company, and business decisions involving negotiations and agreements with the company's supply chain and manufacturers.

53.    A 2013 e-mail from HARRELL, attached as **EXHIBIT "B"**, sets forth STUART'S job duties as follows:

> **Brandi---**
> designs---with Tracy
> researching new patterns, designs
> fabric shopping--with Tracy
> website registrations for both companies--needs to be done at least twice a week
> making order forms for both companies/having forms printed originally and any reorders that are needed
> making sample stickers for both companies shipping samples to all reps before 1st market starts
> set up models and do photo shoots for both companies
> get model consents signed for any new models arrange for models to get clothes earned for modeling edit photos for websites for both companies
> change pictures/descriptions on both websites each season--- sneak peek of each grouping on websites by 1st couple weeks of market; all photos on each website by beginning of last month of market
> attending at least 1 market every season if possible

54.    HARRELL describes her own duties in the same e-mail as

> **Tracy---**
> designs--with Brandi
> scanning all designs to Donna
> researching new patterns, designs
> Fabric shopping--with Brandi
> all communications with Donna regarding designs, approvals, po's, wires, etc
> negotiating pricing with factory
> making spreadsheet of all items for both companies to send to Donna to get pricing each season all bookkeeping---

wires to factory
payroll
payroll taxes
pay all bills
all banking, deposits, reconciliations, etc
recording all deposits in quickbooks
making spreadsheet of reps monthly sales
paying sales reps monthly
assist with photo shoots for both companies
communication and shipping liquidation items to New 2 U
consignment twice a year ordering shipping supplies when
needed
meeting with CPA and preparing taxes
maintaining PC1 compliance for credit cards
attending at least 1 market every season if possible

## 2. How Relator First Learned of HARRELL'S and SIMPLY SOUTHERN'S Fraudulent Activity

55.    As explained, *supra*, STUART is HARRELL'S sister.

56.    At a family gathering in Fall, 2019 STUART and HARRELL engaged in a conversation with their mother regarding President Trump's trade policies.

57.    Their mother inquired whether STUART and HARRELL were concerned that President Trump's policies would negatively impact the business, particularly with regard to the imposition of additional tariffs and duties imported from foreign countries – especially China – where some of the SIMPLY SOUTHERN's clothing is manufactured.

58.    HARRELL then explained that she was not concerned because of her practice of having her suppliers falsely report the value of the imported goods to avoid duties. She implied that the suppliers could simply further lower falsely report

the price of the goods on the import documentation to the extent needed to offset any additional cost incident to additional duties or tariffs.

59.    Both STUART and her mother were shocked at how casually HARRELL discussed defrauding the Federal Government.

60.    HARRELL's response was more or less that it was, "no big deal," because, "everybody does it."

61.    Declarations from STUART'S and HARRELL'S mother and from STUART attesting to this conversation is attached as **COMPOSITE EXHIBIT "C"**.

### 3. Relator's Attempts to Rectify the Problem

62.    STUART repeatedly advised HARRELL that the fraudulent manipulation of the values reported to Customs was a serious offense with serious consequences and told her that she needed to fix the issue and the cease the conduct.

63.    HARRELL consistently refused to do so, and instead responded by beginning to freeze STUART out of more and more aspects of the business.

64.    The agreement between STUART, HARRELL, and their sister, Jami Johnston, had been that each of them would be paid a combination of salary and bonuses that equated to 1/3 of the annual profits of the business. HARRELL began paying STUART less than the compensation to which she was entitled.

65.   HARRELL consistently refused STUART access to the financial information and books of the company, which STUART sought in order to confirm that the fraud had been rectified.

66.   STUART's persistence in pursuing the issue caused a rift in the relationship, and HARRELL ultimately terminated STUART as a result in March, 2020.

67.   Following her termination, STUART contacted Judy Yang, product manager at Fuzhou Qihao Clothing Co., Ltd. ("Fuzhou"), a Chinese manufacturer producing garments for the THREE SISTERS.[3]

68.   STUART bluntly asked Judy Yang by how much Fuzhou reduced the reported invoice price submitted to customs for THREE SISTERS. Yang responded that Fuzhou reduced the reported price on the invoice by 30%. A copy of text correspondence between Yang and STUART is attached as **EXHIBIT "D".**

69.   Upon information and belief HARRELL made similar fraudulent arrangements with other suppliers, including but not limited to:

Ganzhou Yihong Garment Co., Ltd.
No. 12-2 of Chuang Ye Avenue, Guzhang Industrial Park
Shicheng County
Ganzhou, Jiangxi, China 342700

Thai Trang Trading Company Service Import Export Company, LTD
705 Xo Viet Nghe Tinh

---

[3] Fuzhou Qihao Clothing Co., 161, North Jianxin Road of Jinshan Industrial Park, Cangshan District, Fuzhou 350002,Fujian, China.

Ward 26, Binh Thanh District,
Ho Chi Minh City, Vietnam

70.     STUART ascertained that HARRELL would send the full contract price to the suppliers, who would then ship the goods with falsified invoices.

71.     In multiple correspondences to HARRELL and her legal counsel prior to STUART's termination, STUART advised HARRELL of the fraudulent conduct that she had discovered, and the fact that such conduct violated the FCA. One such correspondence, attached as **EXHIBIT "E"**, also highlights the fact that HARRELL, through her companies was engaged in the manufacture and import of counterfeit fabrics that infringe on the trademarks and copyrights of multiple U.S. Companies.

72.     Upon information and belief, HARRELL and her companies have not self-reported any past violations of the FCA and continue to engage in the described fraudulent conduct.

### 4. Further Retaliation by HARRELL

73.     In addition to the retaliatory acts described above, including but not limited to STUART's termination and non-payment of her agreed compensation, HARRELL has further intentionally injured STUART's ability to engage in other business within her industry.

74.     Specifically, and without limitation, HARRELL has made disparaging and/or false and defamatory remarks about STUART to various buyers, vendors, marketing representatives, and trade show organizers.

75.     The full extent of these remarks is unknown, but STUART is aware, specifically that one sales representative, Maggie Thiltgen, was for several months very excited to purchase from a line of children's swimsuits that STUART was launching independently of HARRELL and SIMPLY SOUTHERN.

76.     Immediately after STUART's termination, and upon information and belief after speaking to HARRELL, Ms. Thiltgen was suddenly no longer interested.

### COUNT I – FALSE CLAIMS ACT
### 31 U.S.C 3729(a)(1)(C); (G)

77.     Plaintiff/Relator reasserts and incorporates by reference paragraphs (1-76) as though fully set forth herein.

78.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et. seq.*, as amended.

79.     By virtue of the acts described above, Defendant, HARRELL, individually and together with others, through her s-corporation, Defendant SIMPLY SOUTHERN and its wholly owned LLC subsidiaries, Defendants, EMMA JEAN; BANANA SPLIT; THREE SISTERS DESIGNS, ("THREE SISTERS"); and MILLIE JAY, conspired to and did, "[m]ake, use[], or cause[] to be used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ed] or knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(C); (G).

80.    STUART cannot at this time identify all of the false records, statements, and amounts lost as a result of Defendants' actions. Said actions involved the use of several separate entities, and transactions with several different foreign manufacturers and their agents and representatives, not all of whom are now known to STUART. STUART does not have access to all records or documents relating to the conduct.

81.    The Federal Government, unaware of the scheme perpetrated by Defendants has lost and continues to lose money owed to it in the form of import duties, tariffs and other amounts that it would be paid but for Defednants' illegal conduct.

82.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, and continues to be damaged, in a substantial amount to be determined at trial.

83.    Additionally, the United states is entitled to a maximum penalty of $23,331.00 for each and every violation arising from Defendants' unlawful conduct alleged herein under the new rates for civil penalties published by the U.S. Department of Commerce in January, 2020 pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990.

WHEREFORE, *qui tam* Plaintiff-Relator BRANDI STUART, prays for judgment against Defendants TRACY HARRELL; SIMPLY SOUTHERN STYLES

CORP.; EMMA JEAN KIDS, LLC; BANANA SPLIT, LLC; THREE SISTERS

DESIGNS, LLC; and MILLIE JAY, LLC, and each of them, as follows:

1. That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*

2. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less that $11,463.00 and not more than $23,331.00 for each violation of 31 U.S.C § 3729.

3. That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act.

4. That Relator be awarded all costs of this action, including but not limited to attorney's fees and expenses; and

5. That relator be awarded all such other relief that this Court deems just and proper.

## COUNT II – WHISTLEBLOWER PROTECTION
### 31 U.S.C §3730(h)

84. Plaintiff/Relator reasserts and incorporates by reference paragraphs (1-76) as though fully set forth herein.

85. Plaintiff/Relator was harassed, discriminated against, and ultimately fired due to her attempts to stop the FCA violations described herein.

**WHEREFORE** *qui tam* Plaintiff-Relator BRANDI STUART, prays for judgment against Defendants TRACY HARRELL; SIMPLY SOUTHERN STYLES CORP.; EMMA JEAN KIDS, LLC; BANANA SPLIT, LLC; THREE SISTERS

DESIGNS, LLC; and MILLIE JAY, LLC, and each of them for relief including but not limited to

1.  Reinstatement with the same seniority status that she would have had would have had but for the discrimination.

2.  Two times the amount of back pay.

3.  Interest on the back pay.

4.  Compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

5.  Any further relief this Court deems just and proper.

## COUNT III- BREACH EXPRESS ORAL CONTRACT

86.   Plaintiff, BRANDI STUART, in her individual capacity, reasserts and incorporates by reference paragraphs (1-76) as though fully set forth herein.

87.   At all times material hereto Plaintiff was employed by Defendant, HARRELL, through SIMPLY SOUTHERN, and, by extension, its subsidiaries.

88.   HARRELL paid Plaintiff through one or more of her business entities at various times.

89.   At all times material hereto, Plaintiff's employment was based on an express verbal agreements with HARRELL, on behalf of SIMPLY SOUTHERN, whereby Plaintiff was to be compensated with a salary and with bonuses that were dependent upon the company's performance within given fiscal periods of less than one year.

90.     The services for which Plaintiff were compensated were performed each year within the span of one year or less.

91.     Under her express verbal agreement, Plaintiff's overall compensation each year was to equal 1/3 of the profits of SIMPLY SOUTHERN and its subsidiaries.

92.     It was further agreed among STUART, HARRELL, and their sister that upon separation from the company for any reason, the departing party would be entitled to receive compensation of 1/3 of the value of the company.

93.     HARRELL, together with SIMPLY SOUTHERN and has refused and continues to refuse to pay STUART the compensation to which she is entitled for work completed prior to her termination, as well refusing to distribute 1/3 of the value of the company to her after her termination.

94.     HARRELL and SIMPLY SOUTHERN refuse even to have an independent valuation of the company performed to determine the value of the company.

95.     Moreover, STUART has learned that while she was working for the company, HARRELL was decreasing her compensation by charging back to STUART items that should have been paid by the company, including but not limited to charging the company's portion of payroll taxes for STUART against

STUART's compensation, thereby causing STUART to pay both the employee and employer portions of payroll taxes.

96.   The foregoing constitutes a breach of Plaintiff's express verbal employment agreement. As a direct and proximate result of the breach, Plaintiff has suffered damages.

97.   Further, upon information and belief, HARRELL regularly and routinely used company funds for her own personal expenses and billed these expenses to the company, thereby reducing the profits of the company and wrongfully reducing Plaintiff's compensation.

98.   Upon information and belief, at all times material hereto HARRELL caused SIMPLY SOUTHERN and its subsidiaries to operate with inadequate or insufficient capital to meet the reasonable expectations of such businesses,

99.   The operation of SIMPLY SOUTHERN and its subsidiaries as an insufficiently capitalized entity constituted misuse or fraud in that HARRELL appropriated the revenue and/or assets of the companies to his personal use and benefit

100.   At all times material hereto, HARRELL dominated and controlled SIMPLY SOUTHERN and its subsidiaries to such an extent that their separate identity was not sufficiently maintained and they existence independent from HARRELL through acts including but not limited to

(a) impermissibly commingling business and personal funds;

(b) converting and depleting business funds and assets to her own personal use; (c) failure to observe standard entity formalities.

101.   The entity form of SIMPLY SOUTHERN and its subsidiaries were used by HARRELL for fraudulent or improper purposes.

102.   At all times material hereto SIMPLY SOUTHERN and its subsidiaries were merely the alter-ego or an instrumentality of HARRELL.

103.   The corporate veil should be pierced with regard to this count to hold both HARRELL and SIMPLY SOUTHERN and its subsidiaries jointly and severally liable for the damages suffered by Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Court (1) enter final judgment for all damages to which Plaintiff is entitled in her favor and against Defendants, and each of them; (2) award Plaintiff reasonable attorney's fees and costs; (3) award Plaintiff judgment interest at the prevailing statutory rate; (4) order each Defendant to complete a debtor fact information sheet (Fla. R. Civ. P. form 1.977); and (5) grant any further relief this Court deems just and proper

## COUNT IV – PROMISSORY ESTOPPEL

104.    Plaintiff, BRANDI STUART, in her individual capacity, reasserts and incorporates by reference paragraphs (1-76) and (87-103) as though fully set forth herein.

105.    Pleading in the alternative Plaintiff alleges that if it is determined there is a lack of an express contract, HARRELL promised Plaintiff compensation equal to 1/3 of the companies' profits.

106.    HARRELL further promised that on separation from the company Plaintiff would receive a distribution of compensation equal to 1/3 the value of the company at the time of separation.

107.    HARRELL intended for Plaintiff to rely upon said promise.

108.    Plaintiff justifiably relied on said promise to her detriment by choosing to work for HARRELL's companies rather than to form an independent company or to work for another company.

109.    Plaintiff conferred the continued benefit of her work, including but not limited to her designs, on HARRELL and SIMPLY SOUTHERN, which benefits were accepted by Defendants.

110.    But for HARRELL's promises, Plaintiff would not have continued to work or produce designs for HARRELL and her companies.

111.    Defendants are, therefore, estopped from refusing to honor her promises to STUART.

112.   Enforcement of HARRELL's promises is necessary to avoid injustice to Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Court (1) enter final judgment for all damages to which Plaintiff is entitled in his favor and against Defendants, and each of them; (2) award Plaintiff judgment interest at the prevailing statutory rate; (3) order each Defendant to complete a debtor fact information sheet (Fla. R. Civ. P. form 1.977); and (5) grant any further relief this Court deems just and proper.

## COUNT V – BREACH OF CONTRACT IMPLIED IN FACT/QUANTUM MERUIT

113.   Plaintiff, BRANDI STUART, in her individual capacity, reasserts and incorporates by reference paragraphs (1-76) and (87-103) as though fully set forth herein.

114.   Pleading in the alternative, if it is determined there is a lack of an express contract, Plaintiff asserts that when she was the owner of SIMPLY SOUTHERN, it was her regular and routine practice to for her, HARRELL, and their sister, Jaimie to each receive compensation in the form of salary and bonuses equivalent to 1/3 of the annual profits of the company.

115.   Upon transfer of ownership of the company to HARRELL, it was understood that this practice would continue, with each of three sisters receiving an even distribution of compensation and bonuses.

116.   Based upon the foregoing Plaintiff had a reasonable expectation of receiving equal distribution of 1/3 of the profits, and HARRELL knew or should have known under the circumstances that Plaintiff understood this to be the method for calculating and distributing her compensation.

117.   HARRELL further knew or should have known that Plaintiff had a reasonable expectation of receiving a distribution equal to 1/3 of the value of the company in the event that she separated from the company for any reason.

118.   Based upon the course of dealing and the conduct of the parties HARRELL knew or should have known under the circumstances that Plaintiff understood the conduct of the parties to create an enforceable agreement for Plaintiff to receive the above-described compensation.

119.   Plaintiff fully performed all acts required of her to in order to earn said compensation.

120.   The value of the promised compensation is quantifiable through examination of financial statements, tax returns, books, and records of the company during Plaintiff's employment, and by obtaining a valuation of the company at the time of Plaintiff's termination.

121.   The foregoing establishes a contract implied in fact between the parties for which Plaintiff is entitled to *quantum meruit.*

122.   HARRELL has failed and refused, and continues to fail and refuse, to remit said compensation to Plaintiff.

123.   This refusal constitutes a breach of the implied contract between the parties.

124.   As a direct and proximate result of this breach Plaintiff has suffered damages.

WHEREFORE, Plaintiff respectfully requests that this Court (1) enter judgment in her favor and against Defendants, and each of them, (2) award Plaintiff *quantum meruit* damages; (3) award Plaintiff judgment interest at the prevailing statutory rate; (4) order each Defendant to complete a debtor fact information sheet (Fla. R. Civ. P. form 1.977); and (5) grant any further relief this Court deems just and proper.

## <u>COUNT VI – UNJUST ENRICHMENT</u>

125.   Plaintiff, BRANDI STUART, in her individual capacity, reasserts and incorporates by reference paragraphs (1-76) and (87-103) as though fully set forth herein.

126.   Pleading in the alternative, if it is determined there is a lack of an express contract, Plaintiff asserts that she conferred a benefit on the HARRELL and her companies by, among other things providing them with services and designs that netted a significant profits to the companies.

127.   Plaintiff has not been fully compensated for the benefit conferred. Specifically, and without limitation, HARRELL appropriated company funds to her own personal use and benefit, thereby reducing the amount of compensation to Plaintiff.

128.   HARRELL additionally illegally charged the employer portion of payroll tax against Plaintiff's compensation. A copy of a handwritten breakdown of Plaintiff's compensation, written by HARRELL, is attached hereto as **EXHIBIT F**, and specifically states this.

129.   Further, at least one of the seasonal lines designed by Plaintiff had not yet gone to market at the time of her wrongful termination. The proceeds from that line form part of the basis for determining a distribution or bonus owed to Plaintiff.

130.   This bonus was earned prior to Plaintiff's termination by virtue of her completion of the designs and Plaintiff is entitled to recover that bonus notwithstanding her termination.

131.   Plaintiff is further owed unpaid salary for work she performed in 2020 prior to termination.

132.   Under the circumstances, it would be inequitable for Defendants to retain the benefit conferred by Plaintiff without payment therefore.

133.   WHEREFORE, Plaintiff respectfully requests that this Court (1) enter judgment in her favor and against Defendants, and each of them, (2) award Plaintiff

quantum damages; (3) award Plaintiff judgment interest at the prevailing statutory rate; (4) order each Defendant to complete a debtor fact information sheet (Fla. R. Civ. P. form 1.977); and (5) grant any further relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Demands trial by jury on all issues so triable.

Respectfully submitted this  1st          day of    July              , 2020.

WHIBBS STONE BARNETT, P.A.
801 W. Romana St., Unit C
Pensacola, FL 32502
Phone: 850.434.5395
Attorneys for Plaintiff

By:
Charles M. Caldwell, II, Esq.
FBN: 83528
Primary e-mail: chase@whibbslaw.com